## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **LILLIE M. MIDDLEBROOKS,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:23-cv-00083-TES** |
| **CITY OF MACON-BIBB COUNTY, GEORGIA,** *et al.,* | |
| *Defendants.* | |

## OMNIBUS ORDER

Pro se Plaintiff Lillie M. Middlebrooks hopes to hold ten local-government individuals and entities liable on the allegation that they "deprived" her of her house, land, and property without due process of law by recording an allegedly statutorily deficient quitclaim deed. Following discovery, Defendants moved for summary judgment against Plaintiff, and she moved for summary judgment against the seven Defendants whom she sues in their individual capacity. When taking those motions under advisement in its normal course of business, the Court noticed Plaintiff's use of proper legal citations and headings throughout her briefs. Not to put too fine a point on it, but they were, in all candor, fairly well-written.

The benchmark of a well-written brief is often an elusive goal for many practiced attorneys boasting several years of honed legal-writing skills. Considering that as well

as Plaintiff's pro se status *and* the fact that she is not a licensed attorney, the Court thought it necessary to simply ask whether one assisted her with her briefs. Well, even though the Court unquestionably has a right to know whether Plaintiff received help from a licensed attorney or even a law school student—that was apparently a bridge too far. What began as a simple inquiry about ghostwriting has metastasized into a back-and-forth with the Court that has needlessly consumed far too much of its already limited resources.

Since the Court's inquiry, Plaintiff has taken herculean efforts to transform normal, run-of-the-mill litigation into a platform for interjecting unsubstantiated rhetoric against the Court just so her case can be reassigned to another judge. Rather than just answer the Court's question, Plaintiff chose instead to provide two round-about responses rife with baseless allegations that *this Court*—in 2024—is shrouded in not only Jim Crow ideology, but has the mentality of the Ku Klux Klan. Eye-popping and pearl-clutching accusations, to be sure. As shown below, her mountain of sensational allegations against the Court immediately buckles under the slightest objective analysis. Nevertheless, Plaintiff has made her remarks, and rest assured, her disqualification concerns as well as the merits of her claims will be addressed—thoroughly.

## FACTUAL BACKGROUND

You wouldn't know it yet, but in all, there are 15 motions pending in this case.

Most of them are, of course, aimed at the merits of Plaintiff's claims and the remainder deal with her demands for judicial disqualification. Obviously, the issues surrounding disqualification must be dealt with first, but as with any lawsuit, what it's about is the best place to start.

The first three counts of Plaintiff's Complaint [Doc. 1] assert Fourteenth Amendment Procedural Due Process claims. Count 1 asserts a due process claim against the Macon-Bibb County Superior Court Clerk, Erica L. Woodford, and Tamika Burnett, who Plaintiff alleges is the head of the Real Estate Department for Macon-Bibb County. [Doc. 1, ¶¶ 7–8, 97–103]. Count 2 asserts a due process claim against the Macon-Bibb County Board of Tax Assessors Office and three of its employees—Andrea Crutchfield, Jody Claborn, and Jennifer Mitchell—and Count 3 asserts a due process claim against not only the employees of the Macon-Bibb County Tax Commissioner's Office but against the Tax Commissioner, Samuel Wade McCord, and Cheryl Lee, who, according to Plaintiff serves a supervisor in the Tax Commissioner's Office. [*Id.* at ¶¶ 9–12, 15–16, 104–17]. Next, Counts 4 and 5, respectively, assert claims for municipal liability under 42 U.S.C. § 1983 against the City of Macon-Bibb County based on allegedly unconstitutional policies in effect at the time Plaintiff's claims arose and its alleged failure to train its employees. [*Id.* at ¶¶ 118–42]. And finally, Count 6 asserts state-law claims for breach of contract and promissory estoppel against the Tax Commissioner's Office and Cheryl Lee. [*Id.* at ¶¶ 143–53]. Rapid rundowns of claims

presented in a complaint—like that one—can often be daunting, confusing, and difficult to digest. Thankfully, though, the allegations and facts from which those claims arise are relatively straightforward.

Plaintiff's mother, Shirley Hill Middlebrooks, purchased property at 579 Villa Esta Circle, Macon, Georgia, in 1980. [*Id.* at ¶ 18]; [Doc. 19-2, pp. 1–2 ¶¶ 1–3]. Upon her mother's death on July 7, 2015, Plaintiff alleges that she and her sister, Deidre C. Middlebrooks-Perlitz, were the rightful intestate heirs to the property and should have inherited it by operation of law. [Doc. 1, ¶¶ 18–23]; [Doc. 19-2, pp. 3–5 ¶¶ 8–14].

During a visit to the Tax Commissioner's Office on June 18, 2021, to discuss a tax foreclosure filed against her for "seriously delinquent" property taxes concerning her mother's property, Plaintiff alleges that she "discovered" some surprising news. [Doc. 1, ¶ 34]; [Doc. 34-18, L. Middlebrooks Decl., ¶ 5]; [Doc. 34-18, p. 8]. According to Plaintiff, "Sherlice Morgan of 557 Villa Esta Circle" (who, as you'll notice from the Court's summary of Plaintiff's claims, is *not* a named defendant in this lawsuit) executed a quitclaim deed on January 7, 2021, for Plaintiff's mother to sell her property to her for $1.00. [Doc. 1, ¶ 34]; [Doc. 19-1, ¶ 22]; [Doc. 25-2, p. 3 ¶ 5]. This quitclaim deed was—in Plaintiff's opinion—fraudulent and noncompliant with Georgia law on several fronts and shouldn't have been recorded. [Doc. 1, ¶ 46]; [Doc. 19-2, pp. 6–8 ¶¶ 22–30]; [Doc. 41, p. 2]. Sure enough, though, if you were to look in Deed Book 10825 in the Bibb County Superior Court Clerk's Office, you'll find a quitclaim deed describing a

purported conveyance of "579 Villa Esta Circle" from Plaintiff's mother to Ms. Morgan.
[Doc. 19-16, p. 2]; [Doc. 25-2, p. 3 ¶ 6].

Apparently, Defendant Lee from the Tax Commissioner's Office "assured"
Plaintiff that if she paid the outstanding property taxes, the Tax Commissioner's Office
would keep the property tax records for 579 Vista Esta Circle in her mother's name.
[Doc. 1, ¶ 40]. "Needless to say," Plaintiff alleges that she paid her mother's outstanding
property taxes in the amount of $6,363.32 during her visit to the Tax Commissioner's
Office on June 18, 2021. [*Id.* at ¶ 41]. Then, after allegedly making that payment, Plaintiff
claims that Defendant Lee "instructed" her to pop over to the Clerk's Office in the
county courthouse and ask them to "cancel and expunge" Ms. Morgan's quitclaim
deed. [*Id.* at ¶ 42]. When Plaintiff asked a supervisor from the Clerk's Office how this
seemingly fraudulent quitclaim deed could even be recorded, the supervisor allegedly
informed Plaintiff that quitclaim deeds "are not screened" for compliance with Georgia
law prior to recording "as long as" the filing fee is paid. [*Id.* at ¶¶ 43, 47–48]. What's
interesting about this quitclaim deed, though, if you haven't picked up on it already, is
that it's dated January 7, 2021, and contains Plaintiff's mother's "signature" as the
grantor even though she passed away in 2015. [Doc. 19-16, p. 3]; [Doc. 1, ¶ 18]. In
addition to what Plaintiff alleges is obviously a "forged" grantor's signature, the
quitclaim deed contains Ms. Morgan's signature as the grantee, the signature of a single
witness, and jurat language just above the signature and seal of a notary public. [Doc. 1,

¶ 45]; [Doc. 19-16, p. 3]; [Doc. 25-2, p. 3 ¶¶ 5–6]; [Doc. 41, p. 2].

Once the Clerk's Office refused to cancel and expunge the quitclaim deed, Plaintiff claims that Defendants Woodford and Burnett forwarded it to the Tax Assessors' Office and to the Tax Commissioner's Office where Defendants Crutchfield, Claborn, and Mitchell then put 579 Villa Esta Circle in Ms. Morgan's name despite Defendant Lee's alleged assurance that everything would be kept in Plaintiff's mother's name. [Doc. 1, ¶¶ 40, 48, 54–56]. To lend support to her allegation that 579 Villa Esta Circle *is* in Ms. Morgan's name, Plaintiff, contemporaneously with her Complaint, submitted a copy of an annual tax assessment generated by the Tax Assessors' Office on May 13, 2022. [Doc. 1-3, p. 2]. This annual tax assessment indicates that it was mailed to Ms. Morgan at 557 Villa Esta Circle, and it, in fact, lists 579 Villa Esta Circle as the subject property address. [*Id.* at pp. 2–3]. What's more, the ensuing property tax bill for 579 Villa Esta Circle, contrary to what Defendant Lee allegedly assured Plaintiff, clearly denotes Ms. Morgan as the taxpayer—not Shirley Hill Middlebrooks or either of her two daughters. [Doc. 1-4, p. 2]. After unsuccessful efforts to have the Tax Assessors' Office delete Ms. Morgan's name from property records for 579 Villa Esta Circle or to have the Clerk's Office cancel or expunge Ms. Morgan's quitclaim deed, Plaintiff filed suit in an effort to regain title to her late mother's house. [Doc. 1, ¶¶ 58, 61–63, 66–67, 70]; *see also* [Doc. 1, p. 61 ¶ O].

## <u>DISCUSSION</u>

Again, a total of 15 motions await ruling, and as mentioned above, the Court starts with Plaintiff's arguments regarding disqualification.[1] Since, as discussed below, disqualification is not required in this case, now is just as good a time as any to note that each of the Court's substantive rulings on the merits of Plaintiff's claims are alternative rulings because it dismisses this action as a sanction under Federal Rule of Civil Procedure 41(b) due to her willful refusal to comply with court orders. After first carefully considering Plaintiff's disqualification arguments and laying out its reasons for dismissal under Rule 41(b), the Court nevertheless presses onto the merits of Plaintiff's claims and wraps this Omnibus Order with a discussion on the parties' motions pertaining to summary judgment.

### A.    <u>Judicial Disqualification Is Not Required</u>

As mentioned at the outset of this Omnibus Order, Plaintiff is proceeding pro se, and federal law absolutely guarantees her that right. 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally . . . ."). However, in the midst of reading Plaintiff's summary-judgment motions, the Court noticed the execution of her briefs. Despite the infinite opinions out there and the countless variations of what constitutes "good" legal writing or "proper" Bluebook

---

[1] Although 28 U.S.C. § 455 terms the phrase as one of "disqualification," the Court will, at times (as others often do), use "recusal" as an interchangeable term. While the definitions for the two terms only slightly vary, they are, for our purposes, aimed at the same target—the removal of a judge from a case.

citations, the general appearance of Plaintiff's briefs wasn't that far off. In fact, unlike most handwritten and sometimes near-illegible pro se filings, Plaintiff's submissions, since the inception of this case, have been typed with—what this Court would accept as—proper headings, formatting, spacing, structure, and legal citations. Overall, the presentation and organization of her submissions ought to—at a minimum—cause eyebrow-raising suspicions for any reasonable judge considering non-attorney filings drafted as well as Plaintiff's.

Based purely on the Court's perception of the submissions before it and the fact that Plaintiff indicated her status as a pro se litigant on each and every one of them, the Court became concerned that some unknown attorney may have violated the Georgia Rules of Professional Conduct by ghostwriting. "The preparation of legal documents by an attorney for signature and filing by an ostensibly *pro se* litigant is questionable, at best." Order at p. 2, *Bennett v. Pub. L. Bd. No. 7694*, No. 4:17-cv-00130-RSB-CLR (S.D. Ga. Sept. 11, 2019), ECF No. 28. In addition to "providing substantial legal assistance" to a pro se litigant who would be entitled to the benefit of a court's liberal construction of pro se pleadings, ghostwriting "also inappropriately shields" members of the bar "from responsibility and accountability for [their] actions and counsel." *Id.* at p. 3 (citing *Duran v. Carris*, 238 F.3d 1268, 1272 (10th Cir. 2001) (per curiam)); *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed.").

Alternatively, if someone not licensed to practice law drafted any portion of Plaintiff's filings, that person could be engaged in the unauthorized practice of law. *See* O.C.G.A. § 15-19-51. To quickly resolve any confusion or misunderstanding and to try and protect Plaintiff from the many pitfalls that could adversely affect her in either of these situations, the Court issued an Order to Show Cause [Doc. 33], asking her to explain "who drafted [her] filings or materially assisted her in any way." [Doc. 33, p. 2].

Within a day of receiving the Court's show-cause order, Plaintiff called the Court and informed its Courtroom Deputy that she would not be responding to its inquiry. By the end of that phone call, she went as far as accusing the Court of being racist. Up until Plaintiff's Motion to Disqualify [Doc. 39], not once did any of her filings *ever* mention, suggest, or even hint at the fact that she's a black woman. The Court had no idea that she was a person of color until her phone call. True to her word, Plaintiff did not respond to the Court's inquiry. Not to be overly flippant, but she didn't give it the time of day. Rather than take the avenue of the simplest solution and provide a straightforward response to the Court's inquiry, Plaintiff thought the better course of action would be to get her case reassigned to a different judge altogether. What was never intended to be anything more than a judge wanting to know whether someone with legal training assisted Plaintiff with her filings has been largely misconstrued and warped into unnecessary recusal efforts. In her first Motion to Disqualify [Doc. 39], Plaintiff relies on 28 U.S.C. § 455(a) and formally accuses the Court of being "racist," "a

bigot," and one who subscribes to "Jim Crow's ideology." [Doc. 39, pp. 6–7].

When the Court first brought its concerns to Plaintiff's attention, it unequivocally warned her that her "[f]ailure to respond" to its inquiry "may constitute [a] failure to comply with a court order" which "*would* result in the Court dismissing this action pursuant to [Rule] 41(b)." *See* [Doc. 33, p. 2 (emphasis added)]. The response deadline came and went. And, as for a response that could—in *any* way—be interpreted as one that properly answered the Court's inquiry? Plaintiff didn't say a word. Crickets.

However, she did summarize and rehash what's in her Complaint before getting to her interpretation of the Court's show-cause order. [Doc. 39, pp. 2–3]. She contends that the Court "direct[ed]" her—as "a Black pro se litigant . . . to explain who helped [her] draft" her filings submitted to the Court. [*Id.* at p. 3]. Now, that's not at all what the Court said. In no way did the Court harbor its concerns about ghostwriting, any unauthorized practice of law, or issue its show-cause order because Plaintiff is black. End of story.

From Plaintiff's perspective, however, she argues that an objective, disinterested, lay observer would have doubts about the Court's impartiality. [*Id.* at p. 8]. To support this, Plaintiff iterates a handful of reasons why her case must be reassigned. [*Id.* at pp. 5-13]. Completely absent from any argument or reason for which she demands disqualification is, of course, an answer to whether she received assistance from a licensed legal professional, law school student, or anyone else. The closest she gets to

providing an acceptable response is her argument that "[t]here is simply no logic behind" a show-cause order—and this is Plaintiff's wording, not the Court's— "demanding" a black woman to explain "who helped [her] draft" her filings for this lawsuit. [*Id.* at p. 9]. Had *that* been the Court's inquiry, yes, it would have been illogical and flat-out wrong, but it wasn't. Despite how she perceived it, the purpose of the show-cause order was never meant as an attack, but to make sure that the right person was held accountable for the representations made throughout Plaintiff's filings. *See Duran*, 238 F.3d at 1271–73. If it's just her and her alone? Great! But, that doesn't diminish the fact that the Court's inquiry was intended to protect Plaintiff from a ghostwriting attorney or a non-licensed legal professional who could potentially be taking advantage of her and gaming the system.

Plaintiff chose to seek disqualification instead of properly responding to the Court's concerns about ghostwriting or whether someone (not her, obviously, since she's unquestionably allowed to represent herself) was engaging in the unauthorized practice of law. The Court was arguably within its discretionary authority to dismiss her case right then because she failed to comply with the show-cause order. It did not, however, because it recognizes that dismissal has been described as an "extraordinary" remedy, only justified "where there is a *clear* record of 'willful' contempt and an implicit or explicit finding that lesser sanctions would not suffice." *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) (emphasis added); *Gratton v. Great Am. Commc'ns*, 178 F.3d

1373, 1374 (11th Cir. 1999) (citing *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985)).

So, rather than dismiss Plaintiff's lawsuit based on her non-responsive nature to the

Court's inquiry, it provided her a second opportunity to submit a response directly

addressing the concerns raised by the Court in its show-cause order. This time, after

explaining its reasoning—mainly that filings like Plaintiff's are, "in the Court's

experience," "a rarity with lay litigants"—it specifically and quite simply asked her "to

explain who—if anyone—drafted her filings for her" or whether she "solely drafted

[them]." [Doc. 40, p. 3]. In this second opportunity to comply with its show-cause order,

not only did the Court reaffirm its reliance on Rule 41(b), but it clearly informed

Plaintiff that "[s]hould [she] again refuse to answer, she runs the very real risk" that her

lawsuit "will" be dismissed for her "fail[ure] to follow the Court's lawful order." [*Id.* at

p. 4].

    As the parties' cross-motions for summary judgment began to trickle in, the

Court granted the request for a hearing made collectively by Defendants. [Doc. 26];

[Doc. 29]. On November 13, 2023, the Court scheduled that hearing for December 20,

2023. [*Id.*]. At that hearing, the Court planned to hear arguments for and against

Plaintiff's claims as well as her arguments concerning disqualification. *See* [Doc. 40, p. 2

n.2]. Six days before that hearing, however, Plaintiff doubled down on her efforts to

remove the undersigned from this case. Her first disqualification motion, as you'll

recall, was based on her accusation that the Court's initial show-cause order

"implement[ed] Jim Crow's ideology." [Doc. 39, pp. 4, 6]. This time, Plaintiff banks her second Motion to Disqualify [Doc. 58] on 28 U.S.C. § 144 and contends that the Court's decision to provide her a second opportunity to properly respond to its inquiry "amounts to Ku Klux Klan practices." [Doc. 58, pp. 1, 3]. Again, rather than just simply responding, she says that the Court "virtually accus[ed] [her] of indulging in criminal activity and subject[ed] [her] to a criminal investigation." [*Id.* at p. 3]. It appears that in making that statement, Plaintiff ostensibly concentrated on the Court mentioning the unauthorized practice of law. [Doc. 40, pp. 1–2 (citing O.C.G.A. § 15-19-51)]. However, as the Court has already made clear, Plaintiff absolutely has the right to represent herself. *See* 28 U.S.C. § 1654. So, any mention of the unauthorized practice of law clearly wasn't directed towards her.

Equally as clear is the fact that Plaintiff has remained resolute in her "willful" decision to refuse to properly respond to the Court's perfectly legitimate and simple inquiry about ghostwriting or an unauthorized practice of law. *Gratton*, 178 F.3d at 1374. She could've properly responded in one short, simple sentence: "I wrote these documents myself." Instead of taking that route, despite the Court's leniency in providing her a second, extended opportunity to respond, she chose to douse the record with ramblings that the Court—through "white supremacy policies"—"initiated a criminal investigation" into her filings and "mandated" her to answer questions about "criminal activity." [Doc. 58, p. 7]. In her view, the Court's show-cause orders are—

now, take a deep breath—"absurd, malicious, offensive, illogical, inept, overbearing, ridiculous, hostile, ill-mannered, senseless, foolish, sarcastic, illegal, evasive, antagonistic, disruptive, good-for-noting [sic], ludicrous, reckless, inexcusable, tactless, and unprofessional." [Doc. 58-1, Middlebrooks § 144 Aff., ¶ 41].

Notwithstanding these allegations, the Court still has cause for concern given that Plaintiff cryptically states that she "will not be able to adjudicate" her claims "*until* [she] tells [the Court] who helped [her] compose" her filings. [*Id.* at p. 3 (emphasis added)]. From that, it's highly plausible to assume that there is, in fact, someone behind the curtain. However, before it can proceed any further, the Court must first deal with Plaintiff's disqualification efforts. Although she first sought disqualification under 28 U.S.C. § 455(a) before she turned to 28 U.S.C. § 144, it's more appropriate—given the text of § 144—to consider her motions in reverse.

### 1.    28 U.S.C. § 144

Speaking directly to a judge's bias or prejudice, 28 U.S.C. § 144 states:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.  A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

When seeking disqualification though § 144, "[t]he threshold requirement . . . is that a party file an affidavit demonstrating personal bias or prejudice on the part of the district judge against that party or in favor of an adverse party." *Parrish v. Bd. of Comm'rs of Ala. State Bar*, 524 F.2d 98, 100 (5th Cir. 1975) (en banc).[2] "Since § 144 requires recusal merely on the basis of a party's belief that a judge is biased, without questioning the veracity of the affiant's allegations, it invites abuse" of the judicial process. *United States v. Alabama*, 582 F. Supp. 1197, 1200 (S.D. Ala. 1984). In other words, once a party seeks recusal under § 144, the judge can only pass on the legal sufficiency of the affidavit because the statute "withdraws from the presiding judge" the task of making a "decision upon the truth of the matters alleged." *Parrish*, 524 F.2d at 100; *Berger v. United States*, 255 U.S. 22, 36 (1921). Put succinctly, "[n]either the truth of the allegations nor the good faith of the pleader may be questioned." *United States v. Townsend*, 478 F.2d 1072, 1073 (3d. Cir. 1973). Because § 144 "is heavily weighted in favor of recusal," courts must strictly construe "the statutory standards for compliance" to prevent litigants from abusing and gaming the system. *Young v. Smith*, No. CV214–109, 2015 WL 1541686, at *1 (S.D. Ga. Mar. 31, 2015) (quoting *United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985)); *Alabama*, 582 F. Supp. at 1200; *see also Huff v. Standard Life Ins. Co.*, 643 F.Supp.

---

[2] The decisions handed down prior to the close of business on September 30, 1981, by the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth') "shall be binding as precedent in the Eleventh Circuit" for the court of appeals, the district courts, and the bankruptcy courts. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

705, 707 (S.D. Fla. July 21, 1986) ("The basis for the rule of strict construction is grounded upon the sound principle that there is the possibility of substantial abuse since the harsh remedy of cessation of . . . proceedings is mandated if the allegations purport to state a cause for bias.").

When a party's § 144 affidavit is filed, any "further activity of the judge against whom it is filed" must cease and is limited to a determination of three issues. *Parrish*, 524 F.2d at 100; *Berger*, 255 U.S. at 33 (holding that if a party's affidavit is "accompanied by certificate of counsel," § 144 "directs an immediate cessation of action by the judge whose bias or prejudice is averred"). First, was the affidavit filed timely? *Parrish*, 524 F.2d at 100 (citation omitted). Second, was it accompanied by the necessary certificate of counsel for the movant? *Id.* And third, is the affidavit legally sufficient in its compliance with the statutory requirements? *Id.*

With respect to whether Plaintiff timely filed her § 144 affidavit, that issue— through no fault of Plaintiff's—is kind of muddled. Section 144 requires the moving party to file the affidavit "not less than ten days before the beginning of the term at which the proceeding is to be heard." 28 U.S.C. § 144. However, "[t]his clear deadline is complicated by the fact that 28 U.S.C. § 138, amended in 1963, ended formal terms for district courts." *Crawford v. Marriott Hotel Servs., Inc.*, No. 1:19-CV-02687-CAP, 2020 WL 13594983, at *3 (N.D. Ga. Oct. 28, 2020) (quoting *Roussel v. Tidelands Cap, Corp.*, 438 F.Supp. 684, 691 (N.D. Ala. 1977)); 28 U.S.C. § 138 ("The district court shall not hold

formal terms."). Recalling the Court's above discussion about the scheduled hearing, you'll remember Plaintiff *filed* her § 144-based recusal motion six days before it was to take place. Her signature pages show that she signed her motion and § 144 affidavit on December 13, 2023, but neither were delivered to the Clerk of Court for filing until December 14, 2023. [Doc. 58, pp. 1, 8]; [Doc. 58-1, pp. 1, 15]. Even though Plaintiff signed her motion and affidavit one day and filed them the next, her disqualification effort under § 144 would unquestionably fail on timeliness grounds had the hearing took place as scheduled.

However, in reviewing the tasks § 144 requires of the Court and in light of the fast-approaching hearing date, the Court cancelled the hearing so that it could properly consider the three limited issues discussed above. If, for example, the Court rescheduled the hearing to receive arguments on the parties' cross-motions for summary judgment and discuss the basis of Plaintiff's recusal efforts, her § 144-based motion and affidavit could arguably be timely given that they were made more than "ten days before [any rescheduled] proceeding [wa]s to be heard." 28 U.S.C. § 144. Nevertheless, after reviewing how other courts in this circuit approach the timeliness-of-affidavit issue, to find that Plaintiff timely moved under § 144 would be, in this Court's opinion, erroneous.

Although the ten-day deadline set by § 144 is arguably hazed by the abolishment of formal court terms, courts in the Eleventh Circuit require parties to act with due

17

diligence in filing such an affidavit under § 144. *Crawford*, 2020 WL 13594983, at *3 (quoting *United States v. Hinton*, No. 5:13-CR-32 (MTT), 2014 WL 12690116, at *2 (M.D. Ga. May 29, 2014)); 28 U.S.C. § 138. Some courts call it "due diligence" and others call it "absolute diligence," but regardless of the term of choice, the underlying premise remains the same. *Crawford*, 2020 WL 13594983, at *3 (quoting *Hinton*, 2014 WL 12690116, at *2); *Huff*, 643 F.Supp. at 707; *United States v. Cerrella*, 529 F.Supp. 1373, 1377 (S.D. Fla. Jan. 21, 1982). When it comes to disqualification of a judge under § 144, its timeliness provision requires a party to raise her hand "promptly"—"at the earliest possible moment after learning facts giving rise to a belief of a demonstration of bias or prejudice indicating disqualification." *Cerrella*, 529 F.Supp. at 1377; *Huff*, 643 F.Supp. at 707 (citing *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976)). Here, the timing of Plaintiff's § 144-based disqualification effort falls short of the diligence observed by courts throughout this circuit.

When comparing the general bases for Plaintiff's first disqualification motion—racism, bigotry, and Jim Crow ideology—with the overall bases for her second—racism, white supremacy, and Ku Klux Klan methodology—they're, quite obviously, by and large the same. *Compare* [Doc. 39], *with* [Doc. 58]. Plaintiff filed her first disqualification motion on November 27, 2023; so, it's exceedingly clear she thought that disqualification was warranted based on her belief that Court was a racist, Jim Crow bigot since that date. *See, e.g.*, [Doc. 39, pp. 1, 5–6, 11]; [Doc. 58, pp. 2–3, 7]. The fact that

both disqualification motions come saturated with allegations of racism can only mean one thing: Plaintiff had clearly formed her opinion of the Court over two weeks before she moved under § 144. [Doc. 58, p. 1]. And, because she failed to even attempt to offer any potential "good cause" explanation or reason as to why she didn't rely on § 144 "at the earliest possible moment," her affidavit simply fails as untimely. *Huff*, 643 F.Supp. at 707; 28 U.S.C. § 144 (requiring good cause to be shown for a party's failure to timely file affidavit). Therefore, in assessing the timeliness of Plaintiff's affidavit, it is this Court's opinion that she failed to act with the diligence required and cannot rely on § 144. That said, the Court also notes that she can't seek recusal under § 144 for the simple fact that she is proceeding pro se.

As to the second determination that must be made in connection with Plaintiff's disqualification effort under § 144, the Court looks to see whether her affidavit was "accompanied *by a certificate of counsel of record* stating that it is made in good faith." 28 U.S.C. § 144 (emphasis added); *Parrish*, 524 F.2d at 100 (citation omitted). It wasn't. Given that courts "must accept all facts included in [a parties' § 144] affidavit as true," a certificate from counsel "provides a safeguard that counsel of record can attest to the facts alleged by the affiant as being accurate." *Williams v. N.Y.C. Housing Auth.*, 287 F.Supp.2d 247, 249 (S.D.N.Y. Sept. 25, 2003). To the extent Plaintiff hopes or thinks *her* affidavit is sufficient to satisfy the "certificate of counsel of record" requirement because she is choosing to act as her own attorney, it cannot, and she is incorrect. "A pro se

party cannot supply a certificate of counsel." *Id.*; 28 U.S.C. § 144.

So, like courts throughout the country that routinely invalidate § 144-based motions lodged by unrepresented, pro se litigants, this Court likewise concludes that Plaintiff's failure (or rather, her inability) to produce the required certificate of counsel means that she cannot seek disqualification under that statute. *See, e.g.*, *Mitchell v. United States*, 126 F.2d 550, 552 (10th Cir. 1942) (holding that without a certificate of counsel of record a party's affidavit "is ineffectual to disqualify the judge"); *Brawer v. United States*, 462 F.Supp. 739, 744 (S.D.N.Y. Dec. 13, 1978) (holding that a disqualification request not accompanied by a certificate of counsel of record may fail solely for that reason); *Robinson v. Gregory*, 292 F. Supp. 334, 337–38 (S.D. Ind. 1996) (holding that a party's affidavit filed without a certificate of counsel of record "fails on this threshold matter"); *Mills v. City of New Orleans*, No. Civ.A. 02-2519, 2002 WL 31478223, at *2 (E.D. La. Nov. 4, 2002) (finding that the plain language of § 144 prevents pro se litigants from using § 144 as a mechanism for disqualification); *Everson v. Liberty Mut. Assur. Co.*, No. 1:05-CV-2459-RWS, 2008 WL 1766956, at *2 (N.D. Ga. Apr. 14, 2008) (holding that "procedural deficiencies alone compel the denial" of a § 144 motion). Again, as the Court has already discussed, strict compliance with § 144's requirements is to prevent abuse and protect against "unjustified attempt[s] . . . to disqualify a judge." *Morrison v. United States*, 432 F.3d 1227, 1229 (5th Cir. 1979). Plus, let's not forget that there are "other statutory mechanisms pursuant to which an unrepresented litigant may seek the recusal

of a federal judge." *Clark v. Deal*, No. 2:09–CV–0050–RWS, 2009 WL 4899425, at *2 (N.D. Ga. Dec. 11, 2009). There is, of course, § 455. However, before switching over to that statute, let's discuss a third reason why Plaintiff's motion under § 144 fails.

Her affidavit is not legally sufficient.[3] *Parrish*, 524 F.2d at 100. Again, even though a court knows the allegations in a party's affidavit to be false, it must still take them as true—to the extent they are properly pleaded. *Clark*, 2009 WL 4899425, at *1 (quoting *United States v. Alabama*, 828 F.2d 1532, 1540 (11th Cir. 1987)); *Christo v. Padgett*, 223 F.3d 1324, 1333 (11th Cir. 2000) ("Properly pleaded facts in a § 144 affidavit must be considered as true."). To warrant disqualification, Plaintiff's statements "must be such

---

[3] Regarding Plaintiff's § 144 affidavit, it includes yet another summary of what her case is about; her perceptions of how Georgia's laws regarding intestate succession operate; her extensive litigation history in courts throughout the country; and, most importantly, her opinion of the Court. *See generally* [Doc. 58-1, Middlebrooks § 144 Aff.]. Defendants have collectively objected to certain portions—okay, most of it. [Doc. 60]. As support, Defendants rely on a basic principle for summary-judgment motions—that an "affidavit setting forth legal conclusions" is not properly considered. [Doc. 60, p. 2 n.3 (citing *Bates v. Hunt*, 3 F.3d 374, 378 n.7 (11th Cir. 1993))]. Well first, the obvious, this is a disqualification motion under 28 U.S.C. § 144, not a motion for summary judgment under Federal Rule of Civil Procedure 56. And, recalling what the Court just discussed, when it comes to weighing allegations lodged in a § 144 affidavit, there's not much courts can do. *Parrish*, 524 F.2d at 100; *Berger*, 255 U.S. at 36; *Townsend*, 478 F.2d at 1073.

Technically, yes, Defendants are correct. Legal conclusions presented as factual allegations can chip away at the legitimacy of any affidavit. Thus, § 144 wouldn't ever force courts to accept a legal conclusion as a fact. In the end, though, all the Court is concerned with under § 144 is whether Plaintiff's facts are material to the recusal issue before it and whether they are stated with particularity. *Parrish*, 524 F.2d at 100 (quoting *Thompson*, 483 F.2d at 528). Even though the Court knows Plaintiff's interpretations of its show-cause orders and her perception of the Court that she presents as "fact" based on those interpretations to be false, it seems best to omit nothing from her § 144 affidavit. *Clark*, 2009 WL 4899425, at *2. Given the circumstances surrounding Plaintiff's recusal efforts and in keeping with the spirit of a frightfully archaic statute that is in dire need of congressional reassessment, the Court will give Plaintiff the benefit of doubt by **OVERRULING** Defendants' objections and **DENYING** their Motion to Strike [Doc. 60]. *See* n. 9, *infra*. However, any legal conclusion Plaintiff presented as an allegation of fact certainly was not considered because such statements are not legally sufficient for an affidavit. *Parrish*, 524 F.2d at 100; *Berger*, 255 U.S. at 36.

'that they would convince a reasonable person that bias actually exists.'" *Clark*, 2009 WL 4899425, at *2 (quoting *Christo*, 223 F.3d at 1333). Or, as the Supreme Court put it in *Berger*, the statements made in the affidavit "must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." 255 U.S. at 33–34.

In presenting her § 144 affidavit, Plaintiff must make a three-fold showing. *Parrish*, 524 F.2d at 100 (quoting *United States v. Thompson*, 483 F.2d 527, 528 (3d. Cir. 1973)). Her "facts must be material and stated with particularity." *Id.* Those facts "must be such that, if true they would convince a reasonable [person] that a bias exists," and they "must show the bias is personal, as opposed to judicial, in nature." *Id.* Section 144 is like § 455 except that no affidavit is required to support a disqualification motion made under § 455. *Youngblood-West v. AFLAC Inc.*, No. 4:18-CV-83 (CDL), 2018 WL 5011391, at *2 (M.D. Ga. Oct. 16, 2018) (citation omitted). "Like § 144, § 455 requires disqualification if the judge's impartiality 'might reasonably be questioned' or if he has a personal bias or prejudice for or against a party." *Id.* at *2 (quoting 28 U.S.C. § 455). Therefore, given the substantive similarities between § 144 and § 455, the Court—never quibbling with the veracity of what all she stated in her § 144 affidavit—assesses her allegations under the latter statute.

### 2.   28 U.S.C. § 455

Section 455 provides:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might

reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances:

>> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

28 U.S.C. § 455.

"Under § 455, the standard is whether an objective, fully informed lay observer would entertain significant doubt about the judge's impartiality." *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1329 (11th Cir. 2002) (per curiam). Generally, the "bias sufficient to disqualify a judge must stem from extrajudicial sources" unless "a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party." *Id.* (quoting *Hamm v. Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983)). "Mere 'friction between the court and counsel,' however, is not enough to demonstrate 'pervasive bias.'" *Id.*

Notably, and critically, § 455 does not require a judge to accept all allegations in a motion as true. *Phillips v. Joint Legis. Comm.*, 637 F.2d 1014, 1019 n.6 (5th Cir. 1981). Nevertheless, the disqualification standard under § 455(a) remains a very high bar. *Id.* While § 144 requires allegations sufficient to convince a reasonable person that bias exists, under § 455, the allegations "must show only that a reasonable person 'would harbor doubts about the judge's impartiality.'" *Id.* "The reasonable person is presumed to possess knowledge of all the circumstances" under § 455. *Huff v. Standard Life Ins. Co.*,

683 F.2d 1363, 1369 (11th Cir. 1982). Bias "must stem from extrajudicial sources[] unless the judge's acts demonstrate 'such pervasive bias and prejudice that it unfairly prejudices one of the parties.'" *United States v. Bailey,* 175 F.3d 966, 968 (11th Cir. 1999) (quoting *United States v. Ramos,* 933 F.2d 968, 973 (11th Cir. 1991)).

However, not only must an allegation of bias or prejudice be perceived by a reasonable person as "personal" to a moving party, but that party must also allege "a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate,* either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree." *Liteky v. United States*, 510 U.S. 540, 550 (1994). "'Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.'" *Id*. at 551 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)).

To support her claims of extrajudicial bias and racism, Plaintiff's recusal effort under § 455 first contends that the Court's initial show-cause order and other rulings exhibit evidence of "racism, bigotry, and carr[y] out Jim Grow's [sic] practices." [Doc. 39, pp. 6–7]. Additionally, as support for disqualification, Plaintiff also relies on the fact that the undersigned's now-deceased father acted as the real estate broker when her mother bought the property in question 43 years ago. [*Id.* at pp. 9–12]. Plaintiff's allegations, although large in number, fail to demonstrate *any* "wrongful or

inappropriate" bias (or any bias at all for that matter) against her. *See Liteky*, 510 U.S. at 550. Instead, she blindly heaps conclusory assertions into the record, none of which demonstrate that the Court has acted wrongfully or inappropriately. *Id.*

First, she refers to multiple statements from the Court's initial show-cause order and presents them as evidence that the undersigned "is a racist, is a bigot, and [is] illegally implement[ing] Jim Crow's ideology toward [her]." [Doc. 39, p. 6]. For example, Plaintiff says:

> Judge Tilman E. Self unwarrantedly exhibited direct racism, bigotry, and carried out Jim Grow's [sic] practices toward Plaintiff when Judge Tilman E. Self issued a Jim Crow's show of [sic] cause order directing Plaintiff to notify the Court in writing of [sic] who assisted Plaintiff in drafting Plaintiff's pro se pleading filed in this court. . . . Then, Judge Tilman E. Self discriminatory [sic] demanded for Plaintiff to explain to the court of [sic] who drafted Plaintiff's pro se pleadings and demanded for Plaintiff to explain to the court of [sic] who assisted Plaintiff with Plaintiff's pro se pleadings.

[*Id.*]. Again, it's important to note that until Plaintiff made her accusations of racism, the Court had no idea—nor does it now care—that she's black. Nothing in her Complaint, any exhibit, or the Civil Cover Sheet [Doc. 1-11] ever identified her race. [Doc. 1-11, p. 1].

The Court's initial show-cause order resulted from its legitimate concerns with non-attorneys representing pro se litigants or licensed attorneys ghostwriting for them so that they may sign and present filings as their own. Here, Plaintiff's briefs contained proper legal citations and were structured just like most attorney-drafted filings. Thus,

as the Court has already mentioned, it rightfully inquired (as it has in similar instances) about whether Plaintiff received drafting assistance. *See, e.g.*, Order to Show Cause, *Walker v. Butts Cnty.*, No. 5:18-cv-00155-TES-CHW (M.D. Ga. July 17, 2018), ECF No. 5; Order to Show Cause, *United States v. Vehicle*, No. 5:23-cv-00220-TES (M.D. Ga. Aug 3, 2023), ECF No. 6. Plaintiff, however, clapped back with a non-responsive argument that she "is not mandated under any federal statute in the United States of America to disclose [her] resources for adjudicating [this] case." [Doc. 39, p. 7]. While that may be true, there are a slew of other authorities that 100% require the disclosure of potential legal assistance that Plaintiff appears to—for some reason—be working so hard to conceal. *See, e.g.*, [Doc. 33, p. 2 n.1].

Then, within its second show-cause order, the Court took the time to explain its reasons for its concerns. *See generally* [Doc. 40]. Of course, there's the obvious route that someone with a legal education is mysteriously assisting Plaintiff in drafting everything she's filed in this case. Assuming, hopefully, that's not the case, the Court also knew it was a possibility that Plaintiff could've been an attorney licensed in another state besides Georgia or perhaps attended a year or two of law school. Or, just as easily possible, Plaintiff may have drafted well-organized and well-written filings all on her own.[4] Be it any of these possible scenarios, *both* of the Court's show-cause orders

---

[4] According to her § 144 affidavit, Plaintiff states that she has filed "precise petitions for writ of certiorari in the United States Supreme Court" as well as an array of documents in a few federal district and appellate courts. [Doc. 58-1, Middlebrooks § 144 Aff., ¶¶ 33–40]. Plaintiff says that none of the justices or

provided Plaintiff an opportunity to explain why her filings were so well done. If the last scenario is true—and had Plaintiff simply just communicated that to the Court—the show-cause inquiry would have been handled, the Court would have complimented her on her effort, and she—through plain and simple cooperation—would have arguably stripped any discretion from the Court to dismiss her case for failure to comply with its orders. At the end of the day, though, regardless of whichever route looms in the background of this case: the Court has the right to know.

Plaintiff further argues that disqualification under § 455 is required because the undersigned "did not issue an order threatening to enter judgement against the white attorney's clients for the white attorney failing to explain to court of [sic] who assisted the white attorney in drafting the white attorney's pleadings filed in this Court."[5] [Doc. 39, p. 7]. Well, they're licensed attorneys so . . . the Court hopes one would be able to deduce why it didn't make such a nonsensical inquiry.

Second, Plaintiff argues that the Court is biased. [*Id.* at p. 8]. She contends that some of its rulings in this case indicate that it is acting as "de facto defense counsel for

---

judges presiding over those cases inquired about whether she received assistance with her filings. [*Id.* at ¶ 43].

[5] The docket reflects that attorneys Lauren N. Schultz, Esq., and Holden Park Burford, Esq., of James Bates Brannan Groover LLP represent Defendants. Both Ms. Schultz and Mr. Burford are licensed attorneys admitted to practice law in the State of Georgia and, therefore, may draft and sign legal documents and court filings on behalf of clients. *See* Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented.").

Defendants." [*Id.*]. Plaintiff's sole reason for her assertion of bias is because the Court didn't give her a chance to object prior to it "immediately" issuing rulings on the most basic and routine housekeeping motions. [*Id.* at p. 9]. However, Plaintiff forgets that Local Rule 7.7 allows the Court to rule on motions to exceed the page limitation for briefs and other similar motions "immediately after filing." LR 7.7, MDGa. In one such ruling, the Court partly granted Defendants' Motion to Consolidate [Doc. 35]. Defendants wanted to consolidate their responses to Plaintiff's seven motions for summary judgment into three responses not to exceed 90 pages. [Doc. 35, pp. 2–4]. As Defendants noted, their request greatly limited the number of pages for *their* responses—from seven chances to write 20-page briefs that could total 140 pages—to 90 pages. [Doc. 35, pp. 3–4]; *see also* LR 7.4, MDGa. Although the Court allowed Defendants to consolidate their responses as requested, it "ha[d] full confidence that [they] c[ould] adequately present their consolidated responses in a combined total of 75 pages." [Doc. 36]. Notwithstanding the fact that the Court granted Defendants' request in part by only allowing them to submit 75 pages collectively, Plaintiff argues that this decision shows that the Court is "acting as a de facto counsel for Defendants" because she is black and because "Tilman E. Self is not receptive to a Black pro se litigant standing her ground against a white law firm." [Doc. 36]; [Doc. 39, p. 10]; *see* [Doc. 36].

"The Supreme Court has held that where a judge's challenged actions 'consist[ed] of judicial rulings, routine trial administration efforts, and ordinary

admonishments (whether or not legally supportable) to counsel and to witnesses,' these actions are not sufficient to require a judge to recuse himself under § 455. *Canals v. Archdiocese of Miami, Inc.*, No. 05-13764, 2006 WL 1594227, at *1 (11th Cir. June 12, 2006) (per curiam) (quoting *Liteky*, 510 U.S. at 556). Thus, neither of the Court's show-cause orders (nor any other decision in this case for that matter) presents any evidence of bias against Plaintiff or any evidence of bias in favor of Defendants.

Third, and finally, in another attempt to demonstrate bias, Plaintiff argues that there are extrajudicial sources in play requiring disqualification simply because the undersigned's father acted as the real estate broker for the sale of the house at issue to Plaintiff's mother in 1980.[6] *See* [Doc. 39, pp. 11–12]. In her § 455-based disqualification motion, Plaintiff claims that her "family was the first Black family to move on[to] Villa Esta Circle" back in the 1980s. [*Id.*]. Why is this a concern for Plaintiff? Well, she believes that the undersigned has become "irate" at the possibility that his father's "actions toward[s] Plaintiff's family will be exposed in this case." [*Id.* at p. 12]. As has become something of a trademark for her, Plaintiff offers plenty of accusations and nothing to support them. In other words, her claims of extrajudicial bias may be high

---

[6] Federal law requires "[a]ny justice, judge, or magistrate judge" to disqualify himself if "a person within the third degree of relationship to [him] . . . [i]s a party to the proceeding, or an officer, director, or trustee of a party; [i]s acting as a lawyer in the proceeding; [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; [or] [i]s to the judge's knowledge likely to be a material witness in the proceeding." 28 U.S.C. § 455 (b)(5)(i)–(iv). Not only did the undersigned's father pass away in 2008, but to the extent she hopes, Plaintiff will find no support for disqualification under § 455(b)(5) even though the undersigned's father assisted in the property sale in 1980.

revolution, but they have absolutely no torque.

The undersigned can unequivocally state that he knew next to nothing about any sale that his father may have brokered in 1980. At that time, the undersigned was 12 years old and was infinitely more concerned about the plight of the Los Angeles Dodgers and the batting average of their first baseman, Steve Garvey. And, while the undersigned may have many fond memories of his late father, he certainly doesn't know anything about this particular sale that occurred more than four decades ago. Apparently, Plaintiff knows more about the undersigned's dad than he does because she claims that his father's "actions . . . will be exposed in this case." [*Id.*]. Of course, rather than disclose these four-decade-old actions that supposedly support her arguments for disqualification under § 455, Plaintiff chose to keep that tidbit of information to herself. That's not how this works, though. If Plaintiff is going to so adamantly demand disqualification with nothing more than secret threats, she actually has to show her cards, not hide behind them. Since she's chosen to conceal her hand, she has placed nothing in the record that would cause "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought" to "entertain a significant doubt about the [undersigned's] impartiality." *Canals*, 2006 WL 1594227, at *1 (quoting *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003)). Nothing Plaintiff has submitted to the Court for consideration even remotely begins to demonstrate how the undersigned's father's alleged "actions" that

helped Plaintiff's family become the first black family to buy a house on a particular street some 40 odd years ago amounts to this Judge's present bias. [Doc. 39, p. 12].

Moreover, with respect to Plaintiff's unsubstantiated allegations concerning the undersigned's father, one must recall an all-important detail—she's not suing Defendants over the legitimate deed from the 1980 transaction. She's suing about the supposedly fraudulent quitclaim deed from 2021 that involves Ms. Morgan. *See* [Doc. 19-2, p. 6 ¶¶ 22–23]. Just as the Court wasn't aware of Plaintiff's existence, let alone her race until *she* brought it up, the Court was likewise unaware of the 1980 transaction brokered by his dad.

Bottom line: None of Plaintiff's specious contentions demonstrate any personal bias or prejudice against her. *See Liteky*, 510 U.S. at 550. Not a single concern, show-cause order, or ruling from the Court has been inflamed by "wrongful or inappropriate" motives because of Plaintiff's race or the close familial tie to the real estate broker from 1980. *Id.* For these reasons, Plaintiff has not alleged a form of personal bias that is wrongful or inappropriate as contemplated by § 455. Each of her bases for recusal, whether they be under § 455 or § 144, are inadequate under the principles described by the Supreme Court and from courts within the Eleventh Circuit. *See id.* at 556; *see also Thomas*, 293 F.3d at 1329; *Hamm*, 708 F.2d at 651. While it's clear that Plaintiff certainly doubts the Court's impartiality—to focus on her doubt calls the wrong question into focus. *Huff*, 683 F.2d at 1369.

Given the lack of particularity with which Plaintiff makes her statements in her §
144 affidavit and the sparsity of uncorroborated allegations sprinkled thought her § 455-
based disqualification motion, the Court finds that no reasonable lay person would
doubt its impartiality. *Parrish*, 524 F.2d at 100; *Canals*, 2006 WL 1594227, at *1.

It goes without saying that under our case law, unhappy litigants don't get to
slough off judges they don't like or don't want to preside over their cases by just
randomly calling them racists or bigots or white supremacists or by offering other knee-
jerk, wolf-crying accusations. When judges are unfairly targeted with any sort of
terrible and untrue accusations, they must refuse to give into the attempted character
assassination or attempted "cancelling" all too common in today's America. Judges
must disqualify themselves *only* when the law requires. After all, "there is as much
obligation for a judge not to recuse when there is no occasion for him to do so as there is
for him to [recuse] when there is." *In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014)
(quoting *Burger*, 964 F.2d at 1070). Plaintiff's Motion to Disqualify [Doc. 58][7] under 28
U.S.C. § 144 and her Motion to Disqualify [Doc. 39] under 28 U.S.C. § 455 are **DENIED**
because our law does not require a judge to remove himself from a case at the first sight
of "unsupported, irrational, or highly tenuous speculation." *In re Moody*, 755 F.3d at 895
(quoting *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986)).

---

[7] The untimeliness of Plaintiff's § 144 affidavit and her inability to provide a certificate of counsel,
unquestionably permit a denial of her § 144-based recusal effort on procedural grounds as well. *Everson*,
2008 WL 1766956, at *2; *Williams*, 287 F.Supp.2d at 249; 28 U.S.C. § 144.

The Court made its concerns quite clear within its show-cause orders. All the Court hoped to achieve by them was to avoid potential conduct that could "undermine[] the integrity of the adjudicative process." [Doc. 33, p. 2 n.1 (citing Ga. R. of Prof'l Conduct 3.3, cmt. 2)]. And, by choosing to hem and haw and get her case reassigned to a different judge, Plaintiff deliberately missed not one, but two opportunities to properly respond to and address those concerns. Therefore, based on her "repeated[] and stubborn[] defian[ce]" in complying with multiple orders from the Court on top of the fact that she has been forewarned of this potential sanction twice, it finds that dismissal under Rule 41(b) is warranted. *Moon*, 863 F.2d at 839; *Gratton*, 178 F.3d at 1374 (citing Fed. R. Civ. P. 41(b)) ("Rule 41(b) authorizes a district court to dismiss a complaint for failure . . . to comply with a court order . . . ."). Her unavailing disqualification efforts "indicate no willingness to comply with court orders," so the Court, in exercising the discretion afforded to it by Rule 41(b), **DISMISSES** this action **with prejudice**. Fed. R. Civ. P. 41(b); *Moon*, 863 F.2d at 837, 839 (holding that "dismissal upon disregard of an order, especially where the litigant has been forewarned," can be a permissible sanction).

In the event a reviewing court determines that this Court should have been more patient with Plaintiff by providing her a third opportunity to properly respond to its inquiry, the overall outcome of her lawsuit would remain unchanged since none of her claims survive summary judgment.

B.    <u>**Summary Judgment**</u>

Several assertions made throughout nearly identical declarations Plaintiff

submits in support of her summary-judgment efforts against those sued in their

individual capacity are the subject of a number of objections. Again, Defendants assert

their objections on the premise that legal conclusions in an affidavit cannot be treated as

factual support at summary judgment. [Doc. 27, p. 2 ¶ 1 (citing cases)]; *see also* n.3,

*supra.*

Summary judgment is appropriate under Federal Rule of Civil Procedure 56

where there is no genuine material issue of fact, and the moving party is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(a). As such, Plaintiff must rely on

evidence in the record—not legal conclusions—to win on a motion for summary

judgment. In looking at her various declarations[8] made pursuant to Rule 56(c)(4),

Plaintiff has certainly attempted to masquerade legal conclusions as factual assertions.

Littered among some facts about which Plaintiff can certainly testify—like her relation

to Shirley Hill Middlebrooks—are her interpretations of laws regarding intestate

succession and joint ownership of property. *See, e.g.,* [Doc. 32-3, Middlebrooks Decl., pp.

4 ¶¶ 11–13]. Defendants correctly point out such matters involve questions of law for

---

[8] With respect to Plaintiff's Motion for Summary Judgment [Doc. 19] against Defendant Burnett, the
Court notes that "Exhibit 1 – Declaration of Lillie M. Middlebrooks" appears to be a copy of the loan
agreement signed by Plaintiff's mother and copies of some other financing documents. [Doc. 19-4]. The
relevant declaration in connection with Plaintiff's summary-judgment motion against Defendant Burnett
comes later in Plaintiff's compilation of documents supporting that motion. *See, e.g.,* [Doc. 19-21,
Middlebrooks Decl., pp. 10–13].

determination by the Court and are not factual contentions upon which Plaintiff can rely in her pursuits of summary judgment. [Doc. 27, pp. 2–3 ¶¶ 1–3]. *Manning v. Engelhard Corp.*, 929 F.Supp. 1508, 1515 (M.D. Ga. 1996) (quoting *Smith v. Forrester*, 274 S.E.2d 101, 103 (Ga. Ct. App. 1980)), *aff'd*, 111 F.3d 897 (11th Cir. 1997) (noting that "answers, depositions[,] or affidavits containing mere legal conclusions and allegations [do not] present . . . issues of fact on a motion for summary judgment"). In other words, Plaintiff cannot "declare" as fact that she and her sister "became the joint property owners to the house, land, and property located at 579 Villa Esta Circle" when her mother died without a will. [Doc. 32-3, Middlebrooks Decl., p. 4 ¶ 12]. Plaintiff's declarations in which she purports to swear that she is "the legal owner of a tract of land" are not sufficient for her summary-judgment motions. *See* [*id.*]; *Forrester*, 274 S.E.2d at 103. To be sure, the Court reviewed each paragraph of Plaintiff's declarations that Defendants find objectionable; however, her complete declarations do not materially alter or impact its ruling in any way. Accordingly, the Court **OVERRULES** Defendants' objections and **DENIES** their requests to "strike the offending portions of [Plaintiff's declarations] from the record."[9] [Doc. 27]; [Doc. 50]; [Doc. 51]; [Doc. 52].

---

[9] Through their objections, Defendants moved to strike the impermissible assertions Plaintiff made within her declarations. However, motions to strike are filed pursuant to Federal Rule of Civil Procedure 12(f), and they only pertain to pleadings. *See* Fed. R. Civ. P. 12(f); Fed. R. Civ. P. 7(a). When a motion to strike pertains other motions, responses, or exhibits they are routinely denied as improper. *Fluid Control Specialties, Inc. v. Watts Water Techs.*, No. 6:18-cv-1287-Orl-WWB-DCI, 2020 WL 11269994, at *2 (M.D. Fla. Mar. 5, 2020) (citing *Polite v. Dougherty Cnty. Sch. Sys.*, 314 F. App'x 180, 184 n.7 (11th Cir. 2008)) (finding no error in the district court's denial of a motion to strike an affidavit because "motions to strike are only appropriately addressed towards matters contained in the pleadings . . . and an affidavit . . . submitted as

Now, having dispensed with this quick preliminary matter, the Court finally turns to the substance of the parties' cross-motions for summary judgment that address the merits—or lack thereof—of Plaintiff's claims.

### 1.    Legal Standard

To reiterate, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ.

---

part of the motion for summary judgment . . . is not a pleading"); *see also Barnes v. Guaranteed Price Movers, LLC*, No. 5:18-cv-00241-TES, 2020 WL 5790401, at *1 (M.D. Ga. Sept. 28, 2020) ("If the movant seeks to strike a filing under Rule 12(f) that is not included in Rule 7(a), that motion is to be denied.").

P. 56(c)(1)(A).[10] "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as

---

[10] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

required by Rule 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

### 2.    Plaintiff's Claims Against the Individual Defendants

Plaintiff moves for summary judgment on her claims that the Individual Defendants—Woodford, Burnett, Crutchfield, Claborn, Mitchell, McCord, and Lee—

deprived her of her interest in her deceased mother's house in violation of her due process rights. First, Plaintiff places O.C.G.A. § 44-5-30 front and center as the supporting basis for her lawsuit. Up until 2015, Georgia law required deeds to be attested by at least *two* witnesses. However, since 2015, Georgia law states: "[A] deed to lands shall be an original document, in writing, signed by the maker, attested by an officer as provided in Code Section 44-2-15, and attested by *one* other witness." O.C.G.A. § 44-5-30 (emphasis added). Again, the quitclaim deed Plaintiff provided in support of her claims consists of a so-called grantor's signature, the grantee's signature, the signature of one witness (the other witness spot is blank), and the signature and seal of a notary public. [Doc. 19-16, pp. 2–3].

Just by glancing at Ms. Morgan's quitclaim deed "without [any] aliunde evidence," why would any of the Individual Defendants not verify, certify, record, enter, refuse to expunge, or use it? *Gilliam v. Burgess*, 151 S.E. 652, 652 (Ga. 1930). Everything that was supposed to be there, was there. [Doc. 19-16, p. 3]. It had a purported grantor signature. [*Id.*]. A notary public (an officer authorized by O.C.G.A. § 44-2-15 to attest registrable instruments) had attested it, and it had been "attested by *one* other witness." [*Id.*]; O.C.G.A. § 44-5-30 (emphasis added). Maybe the one blank witness spot on Ms. Morgan's quitclaim deed is why Plaintiff contends that the quitclaim deed was not recordable—because it was "not attested in the presence of *two* witnesses as mandated by O.C.G.A. § 44-5-30." [Doc. 20, p. 16 (emphasis added)]; *see also* [Doc. 19-16,

p. 3]. By Plaintiff's count, quitclaim deeds executed for property in Georgia must have three signatures in addition to a grantor's signature, but as the Court just discussed, that's not what the law requires anymore. Yes, "[u]nder Georgia law, a deed must be attested by two witnesses," but *one of those witnesses* must be an officer authorized by O.C.G.A. § 44-2-15—like a notary public. *In Re Lindstrom*, 30 F.4th 1086, 1090 (11th Cir. 2022) (citing O.C.G.A. §§ 44-2-15, 44-14-61) (holding a deed invalid on its face because although a notary signed the last page alongside one other witness, the notary failed to attest to the deed). So, in addition to a grantor's signature, Georgia law only requires just two signatures, not three, and Ms. Morgan's quitclaim deed had both.[11]

In support of her summary-judgment efforts, Plaintiff quotes from a 2002 Georgia Court of Appeals case for the proposition that "[a] deed not executed in precisely the manner prescribed in O.C.G.A. § 44-5-30 is not properly recordable and therefore does not give constructive notice to all the world." [Doc. 19-2, p. 7 ¶ 26 (quoting *Lionheart Legend, Inc. v. Norwest Bank Minn. Nat'l Ass'n*, 560 S.E.2d 120, 124 (Ga. Ct. App. 2002))]. Although *Lionheart* certainly states what must occur for a deed to be properly recordable, that case dealt with parties who never recorded a security deed.

---

[11] Plaintiff also appears to argue that the quitclaim deed is not signed by the grantor (her mother, Shirley Hill Middlebrooks) as required by the statute because "the alleged grantor" signed "Shirley Middlebrooks," not "Shirley *Hill* Middlebrooks." [Doc. 19, p. 12 (emphasis added)]; *see, e.g.*, [Doc. 19-16, p. 3]. Tuned to the omission of her mother's middle name from the grantor's signature, Plaintiff's contention—forgery allegations aside—seems to be that the signature is noncompliant because it doesn't include her mother's full name. But, nothing in O.C.G.A. § 44-5-30 requires a grantor to use their full name.

560 S.E.2d at 124. As such, it simply doesn't apply or in any way aid or lend support to the real essence of Plaintiff's claims. The potential variables in play that seem to invalidate Ms. Morgan's quitclaim deed along with the Individual Defendants' lack of awareness of those variables (at the time of its execution) also makes *Lionheart* easily distinguishable. Moreover, neither O.C.G.A. § 44-5-30 nor the *Lionheart* decision creates a cause of action against any of the Individual Defendants, and more importantly, Georgia law has long held that forged deeds are nullities and cannot convey title. *Aurora Loan Servs., LLC v. Veatch*, 710 S.E.2d 744, 745 (Ga. 2011) ("[A] forged deed is a nullity and vests no title in a grantee.").

Second, there are things that Plaintiff argues in her brief that she needed to place in either a declaration or affidavit so that they could possibly be taken as admissible *evidence*—to the extent, of course, she could truthfully make the factual assertion under penalty of perjury. 28 U.S.C. § 1746. Notwithstanding her pro se status, her procedural missteps spell quick problems for her summary-judgment efforts. *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (quoting *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir.2002)) (discussing that pro se litigants are required to conform to procedural rules despite the liberal construction afforded to their pleadings). It's certainly worth noting that Plaintiff's language throughout her seven summary-judgment briefs slightly varies as to the argument she incorrectly proffers as a "fact" to hold against a particular defendant. However, statements made by a party are not evidence and her "unsworn

argument in court submissions does not constitute evidence" for purposes of summary judgment. *Travagilo v. Am. Exp. Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013); *McKenny v. United States*, 973 F.3d 1291, 1302 (11th Cir. 2020) (citing *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004)).

Here's how her verbiage differs across her briefs. Plaintiff argues that Defendants Burnett and Claborn "deprived" her of her property by "verif[ying]" Ms. Morgan's allegedly statutorily deficient quitclaim deed, whereas Defendant Crutchfield did so by "certif[ying]" Ms. Morgan as the owner and taxpayer for 579 Villa Esta Circle. *Compare* [Doc. 19] *and* [Doc. 30], *with* [Doc. 32-1]. Defendant Woodford, on the other hand, allegedly took Plaintiff's property by "recording" Ms. Morgan's quitclaim deed. [Doc. 20]. Defendant Mitchell did so by allegedly "enter[ing]" the quitclaim deed in the Tax Assessors' Office's database system to allow Ms. Morgan to be listed as the owner of the property. [Doc. 28]. Defendant Lee allegedly "refused to expunge" Ms. Morgan quitclaim deed from the database system in the Tax Commissioner's Office. [Doc. 34]. And, Defendant McCord, finally, "used" the quitclaim deed "to bill property tax statements" for 579 Villa Esta Circle to Ms. Morgan. [Doc. 21]. [Doc. 19-2, pp. 6–8 ¶¶ 22–30]; [Doc. 41, p. 2]. Therefore, according to abundant legal conclusions made throughout Plaintiff's summary-judgment motions—the actions of verifying Ms. Morgan's quitclaim deed, certifying it, recording it, entering it, refusing to expunge it, or using it for tax-billing purposes amounts to a deprivation of property without due process of

law under the Fourteenth Amendment.

The basis of Plaintiff's Procedural Due Process claims hinges upon the idea that the Individual Defendants have a duty to act as real estate attorneys or title examiners. In other words, Plaintiff would have the Individual Defendants investigate every single title recorded and ensure that each deed is legally sufficient under any potentially relevant statute to transfer every conceivable property interest correctly, properly, and lawfully between a grantor and grantee. *See, e.g.*, [Doc. 1, ¶¶ 64, 71]. Applying Plaintiff's novel legal theory would effectively mean that any public employee tangentially involved with deed recordation for the literally hundreds of thousands of deeds filed each year would transform them into the ultimate title insurer so that they become *constitutionally* liable should something go awry with a single one of them.

Hopefully, by now, you can see that this isn't a due process case at all and that Plaintiff is trying to force a square peg into a round hole because the Individual Defendants have no discretion to choose to *not* record deeds.[12] On the contrary, the relevant provisions in the Georgia Code describing a superior court clerk's duty mandates each clerk to record all deeds. "*Every* deed conveying lands *shall* be recorded

---

[12] Plaintiff additionally argues that O.C.G.A. 53-2-1(c)(2)–(3), the intestacy provision for decedents with children and no spouse, "vested Plaintiff with the right to prevent" Defendant Woodford from officially recording Ms. Morgan's quitclaim deed. [Doc. 20, p. 6]. To support her argument, Plaintiff cites *Reed v. Village of Shorewood*, but she fails to explain how this unrelated case from the Seventh Circuit involving a liquor license supports her proposition that a Georgia statute conveyed upon her a property right that could be violated by a superior court clerk recording an allegedly legally deficient deed. [*Id.* (citing 704 F.2d 943, 948 (7th Cir. 1983), *overruled by Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016))].

in the office of the clerk of the superior court of the county where the land is located."

O.C.G.A. § 44-2-1 (emphasis added). "The clerk of the superior court *shall* file, index on

a computer program designed for such purpose, and permanently record . . . [d]eeds."

O.C.G.A. § 44-2-2(a)(1)(A) (emphasis added). No Georgia statute requires (or permits

for that matter) superior court clerks, tax commissioners, or their employees to act as

legally trained title examiners.[13] Defendants argue in their Motion for Summary

Judgment [Doc. 25] that Georgia law clearly delineates recording deeds as a ministerial

act—one that is "simple, absolute, and definite . . . requiring merely the execution of a

specific duty." [Doc. 25-1, p. 7 (citing *Gilliam*, 151 S.E. at 652–63)]; *Roberts v. Mulkey*, 808

S.E.2d 32, 35 (Ga. Ct. App. 2017); *see also Roper v. Greenway*, 751 S.E.2d 351, 353 (Ga.

2013) (citing *Hicks v. McGee*, 713 S.E.2d 841, 844–45 (Ga. 2011)) ("A ministerial duty may

be established by . . . a statute."). "The clerk of the superior court, by reason of the

nature of [her] duties, is empowered with some discretion, but such discretion is not

judicial in its nature." *Gilliam*, 151 S.E. at 653.

　　　　In layman's terms, elected officials such as a clerk of superior court or tax

commissioner (and their deputies) only have a duty to simply file what comes their

way; they don't act as de facto real estate lawyers to make sure the drafters got it right.

---

[13] Plaintiff submitted Defendant Burnett's LinkedIn profile. [Doc. 19-2, pp. 2–7]. According to this submission, Defendant Burnett "verifies real estate instruments including security deeds, . . . quit claim [sic] deeds, . . . and other related documents." [*Id.* at p. 2]. However, vague words that Defendant Burnett placed on her own LinkedIn profile are hardly sufficient to create a constitutional or statutory duty to investigate title.

*See* O.C.G.A. §§ 15-6-61 (describing duties of a clerk of superior court), 15-6-66

(describing duties for each clerk of superior court to provide grantor-grantee index).

Likewise, the employees of the Tax Assessors' Office have no duty—or ability, even—to

dispose of allegedly fraudulent deeds. *See* O.C.G.A. §§ 48-5-299 (describing the county

board of tax assessors' duty to ascertain taxes owed, not to ascertain by whom they are

owed), 48-5-263 (describing qualifications and duties of a county tax appraiser). And,

just as Plaintiff described the method of transfer in her Complaint, a tax commissioner

just takes what a superior court clerk sends him by way of property transfers and sends

out the county's tax bills. [Doc. 1, ¶ 54]. Neither Defendant McCord, as the Tax

Commissioner, nor his employees are tasked with checking behind Defendant

Woodford, as the Superior Court Clerk (or her employees), to effectively act as a title

examiner of last resort. In fact, Georgia law explicitly states that "[n]othing" when it

comes to a clerk of superior court's obligation to file a deed "shall be construed to affect

the validity, enforceability, or priority of any deed, mortgage, judgment, or lien of any

kind between the parties thereto." O.C.G.A. § 44-2-2(f). Recording a deed in a superior

court clerk's office isn't what formally transfers ownership of real property between

transacting parties. "Recording a deed only goes to the priority of lienholders and

purchasers, not the deed's validity." *In re Kyu Sup Mun*, 458 B.R. 628, 631 (Bankr. N.D.

Ga. 2011). In other words, a deed's legal enforceability (or lack thereof) isn't affected by

any actions of a superior court clerk or by his or her employees. Bottom line: the

Individual Defendants haven't breached any duty attributable to their roles as local government officials or employees, and absent a breach of the duty that Plaintiff erroneously hopes exists, the Court could end its analysis now. However, an effort to be thorough, it trudges on.

Even if Plaintiff could establish a legal duty outside of what the Georgia Code requires and could show through the use of sufficient evidence that the Individual Defendants breached their respective statutory duties, she's still missing the all-important element of "harm" to support her Procedural Due Process claims. As should be clear by now, Plaintiff commenced this lawsuit on a rather original concept: By verifying Ms. Morgan's quitclaim deed (or, technically, by not verifying it), certifying it, recording it, entering it, refusing to expunge it, or using it, the Individual Defendants caused her "harm." Someone did, yes, but it wasn't them because the ministerial acts involved in recording a deed and forwarding it to other county offices in the performance of their governmental duties were not what caused Plaintiff's "harm." *See In re Kyu Sup Mun*, 458 B.R. at 631.

The long and short of it is this: Even if Plaintiff has been "harmed," it wasn't by the Individual Defendants. Rather than sue all the wrong people for all the wrong things, Plaintiff had other remedies at her disposal. Soon after her mother's passing, she could've taken the probate route and qualified as the administrator of her mother's estate by completing the necessary paperwork to properly transfer 579 Villa Esta Circle

from her mother's estate to her and her sister. She could have pursued a lawsuit against

Ms. Morgan as the allegedly fraudulent deed drafter. *See* [Doc. 19-2, p. 6 ¶ 22]. She

could've filed a "quia timet against all the world" proceeding to "remove any and all

clouds on the title of that property." *Bowen v. Laird*, 821 S.E.2d 105, 108 (Ga. Ct. App.

2018); *see also* O.C.G.A. §§ 23-3-60–73; *Simmons v. Cmty. Renewal and Redemptions, LLC*,

685 S.E.2d 75, 78 (Ga. 2009). Or—and this is a big "or"—Plaintiff could just ask Ms.

Morgan to execute another quitclaim deed and sign the property back over to her or her

mother's estate and let that new quitclaim deed work its way through the county

offices.

Finally, there just isn't any admissible evidence on the record that Plaintiff

suffered a legally cognizable "harm" at the hands of the Individual Defendants.

Although Plaintiff is adamant in her argument that the recordation of the quitclaim

deed deprived her of her property interest, there simply isn't any evidence of that.

Notwithstanding the title cloud that arguably looms over 579 Villa Esta Circle, what

"harm" has she truly suffered? Plaintiff offered no evidence that she attempted to enter

the property and was locked out or was asked to leave by Ms. Morgan. Similarly,

Plaintiff never put forth any evidence that she tried to sell the property and lost profits

due to the confusing chain of title. And finally, there is nothing on the record indicating

that Plaintiff lost money in attorney's fees by fighting for the property in another court.

All in all, Plaintiff's measure of "harm," whatever it may be, wasn't because of *anything*

the Individual Defendants did because she can't be and hasn't been hurt by a legally

null title. *Aurora Loan Servs.*, 710 S.E.2d at 745. Without a doubt, the facts of this case

paint a frustrating picture, but what is also crystal clear is that Plaintiff can't use the

United States Constitution to make the Individual Defendants pay for what Ms. Morgan

did. Accordingly, Plaintiff's Procedural Due Process claims against each of the

Individual Defendants fail as there is simply no dispute of material fact, and they are

entitled to judgment as a matter of law.

### 3.    Plaintiff's Claims Against the Entity Defendants

In addition to her claims against the Individual Defendants, Plaintiff asserts

claims against Macon-Bibb County, the Macon-Bibb County Board of Tax Assessors'

Office, and the Macon-Bibb County Tax Commissioner's Office (the "Entity

Defendants"). [Doc. 1, ¶¶ 104–53]. Plaintiff alleges that Macon-Bibb County is liable

under 42 U.S.C. § 1983 for having several "unconstitutional customs, polic[ies], and

widespread practices" in place and that its "failure to train" various employees in the

Tax Commissioner's and Tax Assessors' Offices led to her due process rights being

violated. [Doc. 1, ¶¶ 118–41]. Elsewhere in her Complaint, Plaintiff seems to list all

"[e]mployees" for both governmental offices, generally, but the substance of her

allegations only mentions the specific Individual Defendants discussed above—no other

names are given. *Compare* [*id.* at ¶¶ 104–17], *with* [Doc. 1, pp. 35, 38]. The Court will give

Plaintiff the benefit of the doubt and construes this discrepancy of suing all

"[e]mployees" from both the Tax Commissioner's and Tax Assessors' Offices as her

intention to press Procedural Due Process claims against both governmental entities as

a whole.[14] To the extent Plaintiff intends to hold these government entities liable under

§ 1983, her claims fail.

Plaintiff repeatedly uses the exact same phrase in various places throughout her

Complaint to allege that the Entity Defendants—well, arguably, all of the defendants

based on how she framed portions of it—had an "unconstitutional policy, custom, and

practice of recording real estate property deeds and using real estate property deeds

that do not meet the requirements" of O.C.G.A. § 44-5-30. *See, e.g.*, [Doc. 1, ¶¶ 87, 89–

90]. While her Complaint is still better than most litigants proceeding pro se, there are

parts of it that engender so much confusion. *See* n.14, *supra*. Given the wobbly

construction of Plaintiff's Complaint, the most efficient way to address whatever

potential claims she could be pressing against separate government entities or even the

---

[14] Plaintiff names the Macon-Bibb County Board of Tax Assessors as a defendant in Count 2 (which is the only count that seems to assert a cause of action against "the Board"), but that count doesn't really name "the Board" at all. Rather, Plaintiff names the "Macon-Bibb County Board of Tax Assessors Office's Employees in [Their] Individual Capacities." [Doc. 1, p. 35]. However, in the text of Count 2, she lists the "Macon-Bibb County Board of Tax Assessors['] Office" multiple times, as if to assert claims against it as a separate entity. So, out of an abundance of caution, the Court will proceed on the assumption that Plaintiff is attempting to sue a local government entity. *See* [*id.* at pp. 35–38]. Plaintiff did the same thing regarding the Tax Commissioner's Office in Count 3. *See* [*id.* at p. 38]. There, she names "Macon-Bibb County Tax Commissioner Office's Employees In [Their] Individual Capacity" in the count's heading, but she only names the "Macon-Bibb County Tax Commissioner's Office" in the text of that count. *See* [*id.* at pp. 38–41]. Then, in Count 6, Plaintiff names the "Macon-Bibb County Tax Commissioner['s] Office" as if suing it as a separate entity. *See* [*id.* at p. 56]. So, just as it did with the Tax Assessor's Office, the Court will likewise proceed on the assumption that Plaintiff is attempting to sue the Tax Commissioner's Office as a local government entity as well.

county at large, is to look at this case through the lens of *Monell*.

While municipalities are considered "persons" for purposes of § 1983, they "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Every rule has its exception though. While local government entities "may not be sued under § 1983 for an injury inflicted solely by its employees or agents," they can be held liable "when execution of a . . . policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694; *Epps v. Watson*, 3:05-CV-68(CDL), 2006 WL 8445883, at *8 (M.D. Ga. May 25, 2006) (first citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); and then citing *Monell*, 436 U.S. at 694) ("It is true that a local government entity may not be held liable under § 1983 solely for the acts of its employees—§ 1983 liability must be predicated upon the acts of the *entity*."), *aff'd*, 492 F.3d 1240 (11th Cir. 2007).

However, for a local government entity to be held liable under § 1983, common sense; basic logic; and most importantly, binding case law dictates that there must first be an underlying constitutional violation. "[A] *Monell* claim is derivative of—and thus requires—an underlying constitutional violation." *Aracena v. Gruler*, 347 F.Supp.3d 1107, 1120 (M.D. Fla. 2018) (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)); *see also Epps*, 2006 WL 8445883, at *8 (citing *Monell*, 436 U.S. at 694) ("Therefore, for a local

government entity to be held liable under § 1983, the deprivation at issue must have

taken place pursuant to a policy or custom of the local government entity."). As

explained above with respect to Plaintiff's claims against the Individual Defendants, she

failed to carry the day in showing that she suffered any sort of constitutional violation.

Where there's no constitutional violation, there is no *Monell* claim. It's that easy. This

case simply isn't a due process case no matter how hard Plaintiff tries to make it one,

and the Entity Defendants are likewise entitled to judgment as a matter of law.[15]

### 4.    Plaintiff's State-Law Claims

Having addressed Plaintiff's federal claims, all that's left for the Court to

consider is the merits of her state-law claims for breach of contract and promissory

estoppel. [Doc. 1, ¶¶ 143–53]. Plaintiff alleges that Defendants Lee and the Tax

Commissioner's Office breached an oral contract. [*Id*. at ¶ 144]. According to Plaintiff,

Defendant Lee "made oral representations" that the property tax records for 579 Villa

Esta Circle "would [be] maintain[ed]" in Shirley Hill Middlebrooks' name if Plaintiff

"paid [the] outstanding property taxes." [*Id*.]. Plaintiff alleges that she relied to her

detriment on those oral representations because she paid $6,363.32 to bring the property

---

[15] Because this neatly disposes of Plaintiff's claims against the Entity Defendants, the Court need not analyze them under additional potential bars to recovery such as Eleventh Amendment immunity or the fact that neither superior court clerks, tax commissioners, nor their employees are employees of the county itself. GA CONST. art. IX, § 1, ¶ 3; *Kicklighter v. Goodrich*, 162 F.Supp.3d 1363, 1369–70 (S.D. Ga. 2016) (holding clerks of superior court are independent of the counties they serve); *Epps*, 2006 WL 8445883, at *7 (holding that tax commissioner is not a division of a county but is a separate office); *Taylor v. Bartow Cnty.*, 860 F.Supp. 1526, 1536 (N.D. Ga. 1994) ("Deputy clerks of superior court are not county employees, but the employees of the clerk of superior court.").

taxes current. [*Id.* at ¶ 145]. However, if you remember what happened from the Court's factual rundown of Plaintiff's allegations at the outset of this Omnibus Order, you'll recall that although Plaintiff paid the back taxes, the property tax records for 579 Villa Esta Circle weren't ever put back into her mother's name. [*Id.* at ¶ 147]. Based on her alleged conversation with Defendant Lee on June 18, 2021, Plaintiff seeks damages for breach of contract and promissory estoppel. [*Id.* at ¶ 144].

Asserting a claim for breach of an oral contract under Georgia law requires a plaintiff to "allege that the parties agreed to the terms of the contract, that consideration was given for the contract, that the defendant thereafter breached the agreement, and that the plaintiff suffered damages as a result of the breach." *Campbell v. Ailion*, 790 S.E.2d 68, 73 (Ga. Ct. App. 2016); *see also* O.C.G.A. § 13-1-5(b) ("Simple contracts may either be in writing or rest only in words as remembered by witnesses."). Similarly, to prevail on a cause of action under the equitable doctrine of promissory estoppel, a plaintiff is required to show four things. First, the defendant must have made a promise. *McLeod v. Costco Wholesale Corp.*, 894 S.E.2d 442, 448–49 (Ga. Ct. App. 2023) (quoting *Gryder v. Conley*, 836 S.E.2d 120, 127 (Ga. Ct. App. 2019) (citations and punctuation omitted). Second, the defendant should have reasonably expected the plaintiff to rely on that promise. *Id.* Third, the plaintiff must have relied on that promise to his or her detriment. *Id.* And fourth, "injustice can only be avoided by enforcing the promise because the plaintiff forwent a valuable right." *Campbell*, 790 S.E. 2d at 74. In

other words, with respect to the fourth requirement, Plaintiff must show that "as a result of the reliance" she "changed [her] position to [her] detriment by surrendering, forgoing, or rendering a valuable right." *McLeod*, 894 S.E.2d at 449 (quoting *Gryder*, 836 S.E.2d at 127). "The promise need not meet the formal requirements of a contract, but it must, nonetheless, have been communicated with sufficient particularity to enforce the commitment." *Id.*

As mentioned earlier, when a party moves for summary judgment, the nonmovant cannot rest on their pleadings, but must come forward with admissible evidence sufficient to create a genuine issue of material fact. *Josendis*, 662 F.3d at 1315 (citing *Celotex*, 477 U.S. at 324). Applying that well-known principle to this case, Plaintiff can no longer rely on the allegations in her Complaint since Defendants Lee and the Tax Commissioner's Office have moved for summary judgment on her state-law claims. The law requires more of Plaintiff at this stage, specifically, Rule 56 requires admissible evidence to support these claims.

The Court has closely reviewed the many declarations Plaintiff has placed in the record in her pursuit of summary judgment, but there is absolutely no admissible evidence to support her claims for breach of contract or promissory estoppel. Plaintiff did, however, file an additional declaration along with her Motion for Summary Judgment [Doc. 34] against Defendant Lee, but again, there's nothing in it to lend any evidentiary support to her claims that Defendant Lee promised her *anything*. In that

declaration, Plaintiff swears to certain details about her visit to the Tax Commissioner's Office on June 18, 2021. [Doc. 34-18, Middlebrooks Decl., ¶¶ 5–18]. In doing so, Plaintiff states that she had a face-to-face conversation with Defendant Lee where they discussed Ms. Morgan's quitclaim deed and the date Plaintiff's mother died. [*Id.* at ¶ 11]. Curiously absent, though, from this declaration is any sworn statement about Defendant Lee's alleged oral representations. Representations—that if Plaintiff paid the outstanding property taxes for 579 Villa Esta Circle that the property tax records would be kept in Shirley Hill Middlebrooks' name. [*Id.* at ¶¶ 40, 56, 144]. While those allegations certainly run rampant throughout Plaintiff's Complaint, she can't rely on a pleading at this stage. [*Id.*]; *Josendis*, 662 F.3d at 1315 (citing *Celotex*, 477 U.S. at 324); *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("In opposing a motion for summary judgment, a party may not rely on [her] pleadings to avoid judgment against [her]."). She needed to come forward with admissible *evidence* regarding Defendant Lee's alleged oral representations, and she failed to do so. *See also* [Doc. 34-4, Middlebrooks Decl., ¶¶ 1–15].

Although Plaintiff's declaration discusses her supposed conversation with Defendant Lee, nothing in it supports her claims for breach of contract or promissory estoppel. Despite the literally hundreds of pages Plaintiff filed in support of her summary-judgment efforts, she didn't offer one single page of a deposition or any other *evidence* to demonstrate that she relied on the terms of the promise allegedly made by

Defendant Lee. *McLeod*, 894 S.E.2d at 449 (quoting *Gryder*, 836 S.E.2d at 127); *see generally* [Doc. 49-7]; [Doc. 47-1] She hasn't even offered a receipt or documentation of a cleared check for the more than $6,000 in back taxes she allegedly paid on June 18, 2021. [Doc. 1, ¶¶ 33, 41]; *see also* [Doc. 25-2, p. 2 ¶ 3 ("Subsequently, on June 18, 2021, Plaintiff alleges, *without proof*, that she visited the . . . Tax Commissioner's Office . . . to pay $6,363.82 in outstanding property taxes.") (emphasis added)]. Without any admissible evidence to support her claims for breach of contract or promissory estoppel, they fail, and Defendants Lee and the Tax Commissioner's Office are entitled to judgment as a matter of law on both.[16]

## <u>CONCLUSION</u>

In sum, because no reasonable person would doubt the Court's impartiality, it **DENIES** Plaintiff's Motion to Disqualify [Doc. 58] under 28 U.S.C. § 144 and her Motion to Disqualify [Doc. 39] under 28 U.S.C. § 455. Then, as a sanction for Plaintiff's repeated failure to comply with multiple court orders, the Court **DISMISSES** this action **with prejudice** under Rule 41(b). Next, for the reasons discussed above, the Court **OVERRULES** and **DENIES** Defendants' Motions to Strike. [Doc. 27]; [Doc. 50]; [Doc.

---

[16] Additionally, Plaintiff's failure to respond to Defendants' summary-judgment arguments as to these particular claims indicates her abandonment of them. *Clark v. City of Atlanta*, 544 F. App'x 848, 855 (11th Cir. 2013) (holding that district court properly treated claims as abandoned where they were alleged in the complaint but not addressed in opposition to a motion for summary judgment); *see generally* [Doc. 47]. Plaintiff's abandonment of her claims for breach of contract and promissory estoppel provides a separate and independent basis for the Court to grant summary judgment in favor of Defendants Lee and the Tax Commissioner's Office.

51]; [Doc. 52]; [Doc. 60]. And finally, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 25] and **DENIES** Plaintiff's Motions for Summary Judgment. [Doc. 19]; [Doc. 20]; [Doc. 21]; [Doc. 28]; [Doc. 30]; [Doc. 32]; [Doc. 34].

The Clerk of Court is **DIRECTED** to enter Judgment in favor of Defendants and **CLOSE** this case.

**SO ORDERED**, this 12th day of February, 2024.

_S/ Tilman E. Self, III_
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**